[File No. 6179.]

THOMAS McDONALD, Appellant, v. IRVING KOTHS, Respondent.

(249 N. W. 706.)

Opinion filed June 24, 1933. Rehearing denied August 1, 1933.

*Jacobsen & Murray,* for appellant.

*C. F. Kelsch,* for respondent.

Burr, J. As stated by appellant: "This is an appeal from a judgment in an election contest, dismissing the contest with prejudice and awarding the contestee the office of State's Attorney in and for Sioux County."

There are eighteen precincts in Sioux county. The election boards of the precincts canvassed the vote at the close of the election and made their returns. The canvassing board of the county tabulated and canvassed the returns as sent in, found the defendant had a majority of 33 votes, and a certificate of election was issued to him.

The dispute concerns the insufficiency of the evidence to justify the action of the trial court, and the question at issue is narrowed to a controversy over the votes cast in Oak Grove, Two Shields, and Cannon Ball precincts.

On the trial in the district court, when the ballots in these three precincts were examined, it was found that 69 ballots showed marks which would indicate that the voter had voted for both candidates. Contestant claims these ballots were so marked when counted and a comparison of the ballots with the return as certified by the election officials indicates these ballots, whether so marked or not, were counted for the defendant and without these the contestant would have a majority of 36 votes.

The burden of proof is upon the contestant and it is important to determine whether he has shown that a sufficient number of these 69 ballots were double marked when canvassed by the election boards, so that if rejected the contestant would have a majority of legal votes.

The trial court found: "That the official ballots cast in Oak Grove, Two Shields, and Cannon Ball precincts and delivered by the election officers thereof to the county judge as legal custodian, were not wrapped, sealed, kept and preserved as required by law;" and also: "That the official ballots of said three precincts were not in the condition they were in when cast by the voters of said precincts and that they were not genuine. That the fair preponderance of the evi-

dence plainly shows that the official ballots of the aforesaid three precincts have been tampered with since being voted by the electors and that such tampering could have been done after the ballots had been placed in the vault at the Courthouse at Fort Yates."

The court further found that there was not sufficient competent evidence to contradict or impeach the official returns made by the election boards.

Section 1006 of the Compiled Laws says that "in the canvass of the votes . . . any ballot or parts of a ballot from which it is impossible to determine the elector's choice shall be void and shall not be counted. . . ."

Until the contrary has been shown by the evidence public officers are presumed to have regularly performed their duties, and that they have obeyed the law in the performance thereof. Comp. Laws, § 7936, subd. 15; Hannah v. Chase, 4 N. D. 351, 61 N. W. 18, 50 Am. St. Rep. 656; Walton v. Olson, 40 N. D. 571, 170 N. W. 107; State ex rel. Hughes v. Milhollan, 50 N. D. 184, 195 N. W. 292; Sturgeon v. King, ante, 261, 247 N. W. 614, 615. This presumption applies to election officers.

The inspectors of the election are required to "publicly announce the result" of the election as soon as the count is completed and "immediately prepare in triplicate a statement in writing setting forth . . . number of votes cast for each person . . . which statement they shall certify to be correct." A copy of this statement is mailed to the county auditor with other records, for the use of the canvassing board. It is not claimed that the canvass of these returns does not justify the certificate of election. The presumption is that the election officers do not count any double marked ballot, and therefore, if at the time of the canvass of the vote there were marks showing a vote for both candidates, such ballot would not be counted. Some of the election officers at least were familiar with this law. G. Bossert, the inspector of election in Two Shields precinct, testified that where he found a ballot showing a voter had voted for both candidates for state's attorney such ballot was laid aside, so far as that office was concerned, and was not counted.

The election board is required to securely wrap the ballots—the wrapper to be securely pasted or glued at the outer ends so as to com-

pletely envelop and firmly hold the ballots together—the wrappers securely sealed with sealing wax so that they can not be opened without breaking the seal. They are then sent to the county judge and he is required to arrange them properly in order of the precinct numbers, in boxes securely locked, the boxes placed in a fire proof vault and securely kept for four months—not opening nor inspecting them nor allowing anyone else to do so except by order of the court in case of contested election.

The record shows that when these ballots were produced in court at the trial they had been sent to the county judge by the election officers of the three precincts in question, together with the other ballots and the county judge had them placed in a vault in the court house—the only vault there is in the building—and that all of the county officials have access to this vault and the combination on the lock is known to those officers and to the clerks. The county judge testified that so far as he knew any of the officers or clerks could go into this vault and personally examine the ballots without his knowledge and that if they were examined or tampered with that he would not know it. The testimony shows also that when the ballots from these precincts in dispute were produced the seal on the packages were broken and in many cases the ballots could be shaken out of the wrappers, examined and put back without difficulty. It is true that this is not definitely shown with reference to the ballots in dispute.

At the hearing the parties stipulated that the ballots from Oak Grove and Two Shields precincts were "wrapped, sealed, delivered to the Judge of the County Court and by him kept in the same manner as were the ballots of Belden Precinct." The testimony shows that the Belden Precinct ballots were returned to the county judge in a common burlap sack and were never placed in a box or securely locked. The county judge testified that these ballots could be "taken out, opened, examined, re-wrapped, re-stamped and brought back without his knowledge" by certain officers and employees. With reference to Two Shields Precinct the testimony shows that the seals were broken at the time the ballots were taken out of the sack which was produced in court. The county judge testified that both ends of the wrapping paper had been opened. He was questioned and answered as follows:

722

"Exhibit 8 with both seals broken has been kept by you in the sack you produced here in open court in that condition? Yes, sir.

It is a fact, is it not, by holding the paper wrappers the ballots are loose enough that they have been shaken out? It apparently is.

And can be put back in—slid right back into the folder? Yes, sir."

In view of the folding of the ends this must have been apparent to the court also; though the judge said he was of the impression that the package at that time was in the same condition as when he received it.

Contestant cites Averyt v. Williams, 8 Ariz. 355, 76 Pac. 463, as authority to the effect that even though "ballots have not been preserved in strict compliance with the statutory requirements, such noncompliance does not of itself render the ballots inadmissible in evidence, for the provisions of the statute in this respect are not mandatory but directory." This is in harmony with our own ruling in Drinkwater v. Nelson, 48 N. D. 871, 187 N. W. 152. But the condition in which the ballots are found, the opportunity for tampering with them, the manner in which they were kept; a critical examination of the alleged marks for candidates, and whether this shows different forms in the crosses after the names of rival candidates, or shows different kind of pencil and different method are all considered in determining whether the ballots are in the condition they were when counted, and show sufficient evidence to overthrow the presumption of accuracy of the returns made by the election officials and to destroy the evidentiary value to which these returns are entitled. It is true that the fact the ballots may have been tampered with is not in itself sufficient to reject them as evidence; but as said in the Arizona Case cited: "The question as to the preservation of the ballots in their integrity is a question of fact to be determined by the trial court as other questions of fact, and the finding therein is to be reviewed by this court as are findings on other similar questions of fact."

Such is our holding. In Drinkwater v. Nelson, supra, we said: "Where the admissibility of ballots is objected to on the ground that the bundles show that the seals are broken and that they bear other evidences of having been disturbed, the trial court having an opportunity to inspect the bundles is in a more advantageous position to determine whether they had been tampered with than is an appellate court, and its ruling will not be reversed unless clearly erroneous."

One Joe Wicks was a judge of election for Cannon Ball precinct. He testified that there were many ballots cast at that precinct where the voter voted for both candidates and these were counted for the defendant "because the general feeling around Cannon Ball was for Koths." When cross-examined he said he "should judge about somewhere in the neighborhood of thirty some odd" ballots were so double marked and counted for Koths. He testified that he received his appointment as judge from or through the contestant; that he was a friend of the contestee—"not so far as Koths knows, but I am;" that he did not call the attention of any one in the election contest to the fact that he counted for Koths ballots that were double marked, and never mentioned to any one until he was on the witness stand; that after the count was completed he "passed them (the ballots) on a desk back of the stove," that they remained there in the building for eighteen hours; that he left the building unlocked and never returned to the building since, and that he did not "know what happened to them." He says the inspector, in the presence of three others, told him to count the ballots for Koths but none of these was called as witnesses. He said he tried to memorize the number of these ballots that were double marked when counting them, but could not remember the number.

The district court in its findings found that so far as Joe Wicks was concerned "his testimony was so unreasonable and inconsistent with his real interest that the court does not consider it worthy of any belief whatsoever, particularly in view of what the ballots themselves disclose; that is, that many of the ballots from Cannon Ball precinct were marked by different persons and with different pencils and that this could not be if the witness Wicks told the truth."

The trial court was thoroughly convinced Wicks was an unreliable witness. Without his testimony there is nothing to show that the ballots, when presented to the trial court for examination and when offered in evidence, were in the condition they were when counted, and the slipshod manner in which they were wrapped, sealed and kept convinced the trial court they could not be depended upon to determine the contest. Unless the findings of the trial court in this respect are clearly erroneous they will not be reversed upon appeal.

The appellant has not shown to this court sufficient ground for find-

ings different from what the trial court found, and therefore the judgment of the lower court is affirmed.

NUESSLE, Ch. J., and CHRISTIANSON, BIRDZELL and BURKE, JJ., concur.